**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AARON DOBBS, CHARLES FLOWERS and BARRY WILLIAMS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| THE BANK OF NEW YORK MELLON and THE BANK OF NEW YORK MELLON CORPORATION, | |
| Defendants. | |

## I.     INTRODUCTION

1.      This class action lawsuit is initiated by Plaintiffs on behalf of themselves and all investors ("Noteholders") who purchased or otherwise acquired certain note securities issued by Barclays PLC through its subsidiary Barclays Bank PLC ("Barclays") between 2018 and 2020, that were part of several unlawful note offerings (the "Barclays Note Offerings") and included a substantial amount of notes improperly authenticated by The Bank of New York Mellon ("BNY Mellon"), a subsidiary of The Bank of New York Mellon Corporation ("BNYMC," and together with BNY Mellon, the "Defendants") pursuant to a Senior Debt Indenture dated September 16, 2004 and subsequently supplemented and amended (the "Indenture"). The crux of this legal action lies in the severe negligence of BNY Mellon, bad faith, breach of contract, and abdication of its duties, in its pivotal role as indenture trustee for the Barclays Note Offerings under the Trust Indenture Act of 1939 ("TIA"), the New York law, and the Indenture, which collectively outline BNY Mellon's duties as an indenture trustee to ensure the proper authentication of note securities

such as those at issue in this case before they are offered to investors and otherwise take certain key steps to ensure that such notes are properly and lawfully issued and sold to the investing public.

2.      Indenture trustees such as Defendants play a critical role in note offerings such as the Barclays Note Offerings. They are a necessary and indispensable party to such offerings under the TIA, state law, and industry practices going back over a century, and the review and authentication of such note offerings by a trustee is a required step before those note securities may enter the marketplace and be offered and sold to the investing public. The involvement of a reputable trustee like BNY Mellon in a note offering, as evidenced by its authentication of such notes, is typically taken as a crucial seal of legality and safety by the financial markets and public investors.

3.      Consistent with the typical industry practices, as an indenture trustee, BNY Mellon was a key participant in the Barclays Note Offerings at issue here: it was the gatekeeper charged with reviewing the Note Offerings, authenticating the notes at issue, and otherwise taking certain critical steps to ensure that they were properly issued and released into the financial markets for sale to investors such as Plaintiffs. BNY Mellon was grossly negligent, acted in bad faith, violated its contractual duties under the Indenture, and otherwise failed in its duties as Indenture Trustee. The Barclays note investors directly suffered the consequences of its failure.

4.      BNY Mellon's gross negligence, bad faith, and failure to adequately, if at all, discharge its duties allowed for the issuance and sale of illegal note securities by Barclays significantly beyond the limits permitted under the registration statements filed with the US Securities and Exchange Commission (the "SEC" or the "Commission") for those securities offerings. This misconduct led to approximately $17.7 billion in unregistered Barclay note securities being sold into the marketplace alongside billions of dollars of other, lawfully offered

but indistinguishable Barclays notes, to Plaintiffs and other investors. Given that the lawfully issued Barclays notes were indistinguishable from the unlawfully issued ones and all notes were contemporaneously sold to public investors in the US financial markets, those investors could not determine whether the particular notes they had purchased were lawful or illegal, and the entire pool of notes became tainted. Once the unlawful note sales were reported to the SEC and the Commission took action against Barclays, the market for the notes collapsed, the value of the notes dropped, and the Barclays Noteholders, including Plaintiffs, suffered substantial financial losses.

5.      The direct result of BNY Mellon's misconduct in its capacity of Indenture Trustee and gatekeeper of the Barclays Note Offerings was that a massive volume of unlawful notes issued by Barclays improperly entered the US financial markets and were offered for sale to investors, when, had BNY Mellon done its job and followed the Indenture and customary practice in observing the clear limits on the Barclays Note Offerings,  and not issue the certificate of authentication as to those notes – as it should have – those unlawful notes would have never entered the marketplace and been offered to any investors. In effect, BNY Mellon through its improper actions and inactions helped create a market of unlawful Barclays notes.

6.      Defendants' responsibilities under the Indenture, the TIA, the New York law, and the long, well-established practice in such note offerings were clear: to act with the care, skill, prudence, and diligence expected of an indenture trustee, adequately review the Barclays Note Offerings, and properly authenticate the Barclays notes. Defendants' actions and/or inactions demonstrate a flagrant disregard for these duties, leading to a breach in the note securities market that was unprecedented in nature and scope and caused extensive harm to the investing public.

7.     Plaintiffs are seeking remedies for themselves and the proposed class of investors in the Barclays Note Offerings, more fully identified below, for Defendants' misconduct, gross negligence, breach of contract, and breach of its duty of care.

## II.    JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs, and more than one-third of all Class members may reside outside the State of New York.

9.     The Barclays notes at issue here were sold through the national exchanges to investors in numerous states across the country.

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) for the following reasons:

(a)    The substantial majority, if not the entirety, of the acts and omissions charged herein occurred in substantial part in this Judicial District;

(b)    Defendant BNY Mellon is a citizen of this District, chartered and headquartered in the State of New York, and has its principal office in this District;

(c)    The ETNs and the underlying indenture agreement, which governs the relationship among NY Mellon, Barclays, and the holders and beneficial owners of the ETNs, are governed by New York law;

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the

U.S. Mail, interstate telephone communications, and the facilities of the national securities exchanges.

### III.    PARTIES

**Plaintiffs**

12.    Plaintiff Aaron Dobbs is an individual who resides in and is a citizen of Montague County, Texas. Plaintiff Dobbs is an experienced  investor who owns and manages his own business. Mr. Dobbs purchased VXX ETNs, which are part of the Barclays notes at issue in this case, on the Chicago Board Options Exchange ("CBOE"), during the Class Period.

13.    Plaintiff Charles Flowers is an individual who resides in and is a citizen of Angelina County, Texas. Plaintiff Flowers is an experienced  investor who owns and manages multiple businesses. Mr. Flowers purchased VXX ETNs, which are part of the Barclays notes at issue in this case, on the Chicago Board Options Exchange ("CBOE"), during the Class Period.

14.    Plaintiff Barry Williams is an individual who resides in and is a citizen of Dallas County, Texas. Plaintiff Williams is an experienced investor who owns and manages his own business. Mr. Williams purchased VXX ETNs, which are part of the Barclays notes at issue in this case, on the Chicago Board Options Exchange ("CBOE"), during the Class Period.

**Defendants**

15.    The Bank of New York Mellon, formerly known as The Bank of New York, is a New York state-chartered banking corporation, headquartered in New York, NY and a citizen of that state, which served as the indenture trustee for the note securities issued by Barclays under the Senior Debt Indenture dated September 16, 2004, at issue in this case. Defendant BNY Mellon is a US subsidiary of Defendant The Bank of New York Mellon Corporation.

16.    The Bank of New York Mellon Corporation, a Delaware corporation headquartered in New York, NY, and a citizen of New York, is a global bank that engages, through its US banking

subsidiaries, in trust and various securities-related activities, among other things. One of Defendant BNYMC's two principal subsidiaries is Defendant BNY Mellon.

**Relevant Non-Parties**

17.    Non-party Barclays PLC ("BPLC") is a bank holding company, headquartered in London, United Kingdom. BPLC provides various financial services, including investment banking, wealth management, and the offer and sale of securities.

18.    Non-party Barclays Bank PLC ("Barclays"), headquartered in New York, New York, is a wholly owned United States subsidiary of Barclays PLC, a global bank holding company headquartered in London, United Kingdom. Barclays consists of a corporate and investment banking division, a consumer, cards, and payment division, and a private bank. Barclays is the issuer of the Barclays notes at issue in this case, that were part of the unlawful Barclays Note Offerings:

      a.   iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX");

      b.   iPath Series B Bloomberg Energy Subindex Total Return ETN ("JJE");

      c.   iPath Pure Beta Crude Oil ETN ("OIL");

      d.   Pacer iPath Gold Trendpilot ETN ("PBUG");

      e.   iPath Series B Carbon ETN ("GRN");

      f.   iPath Series B Bloomberg Natural Gas Subindex Total Return ETN ("GAZ").

## IV.     FACTUAL ALLEGATIONS

### A.  BARCLAY'S UNLAWFUL NOTE OFFERINGS

#### 1.    Barclays's ETNs and Defendants' Role as Indenture Trustee of the Barclays Notes

19.     BPLC, through its subsidiary Barclays, is the issuer of the series of ETNs identified in paragraph 18, *supra*.

20.     The indenture trustee of those ETN series at all times relevant was BNY Mellon, pursuant to the Indenture.

21.     Among those ETNs, the most widely sold to the public was iPath Series B S&P 500 VIX Short-Term Futures ETN, or VXX, designed to provide exposure to the VIX Index by tracking Chicago Board Options Exchange Volatility Index (VIX) futures.

22.     The VIX estimates expected market volatility over the next 30 days by tracking options linked to the benchmark U.S. S&P 500 stock index. Historically, the VIX tends to be elevated in periods of market distress and lower under normal market conditions, and it often moves sharply higher when stock indices decline significantly. For this reason, it's often referred to as the market's "fear gauge."

23.     Barclays explains that VXX is:

> designed to provide exposure to the S&P 500® VIX Short-Term Futures TM Index Total Return (the "Index"). The ETNs are riskier than ordinary unsecured debt securities and have no principal protection.  The ETNs are unsecured debt obligations of the issuer, Barclays Bank PLC, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. **Any payment to be made on the ETNs, including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due.**[1] An investment in the ETNs involves significant risks, including possible loss of principal and may not be suitable for all investors.

---

[1] Emphasis added.

The Index is designed to provide access to equity market volatility through CBOE Volatility Index® (the "VIX Index") futures. The Index offers exposure to a daily rolling long position in the first and second month VIX futures contracts and reflects market participants' views of the future direction of the VIX index at the time of expiration of the VIX futures contracts comprising the Index. Owning the ETNs is not the same as owning interests in the index components included in the Index or a security directly linked to the performance of the Index.

24.     The other ETNs identified in paragraph 18 were designed to provide exposure to various other market indexes, financial products, or commodity prices. Like VXX, those other ETNs were publicly traded on CBOE. Also, like VXX, the other ETNs were unsecured debt obligations of Barclays Bank PLC and had similar risk features.

### 2.   Barclays "Well-Known Seasoned Issuer" Status

25.     In 2005, in its Securities Offering Reform release, the SEC adopted modifications to the registration, communications and offering processes under the Securities Act. One of the reforms in the SEC's 2005 modifications was the adoption of a new category of issuer—the "well-known seasoned issuer" or, for short, "WKSI." The SEC designed WKSI to apply to the most widely followed issuers representing the most significant amount of capital raised and traded in the United States.

26.     Under Securities Act Rule 405, a WKSI is an issuer that meets the registrant requirements of Form S-3 or Form F-3 and either: (1) "[a]s of a date within 60 days of determination date, has a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates of $700 million or more"; or (2) "as of a date within 60 days of the determination date, has issued in the last three years at least $1 billion aggregate principal amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act." 17 C.F.R. § 230.405.

27.     Issuers who are WKSIs benefit from the flexible communications and registration rules and regulations in the 2005 Securities Offering Reform, most notably that WKSIs may register their securities offerings on shelf registration statements that become effective automatically upon filing. In practice, this reform means there is no requirement for WKSIs to wait for the Division of Corporation Finance at the SEC to review the registration statement and declare it effective before the WKSI is permitted to make offers and/or sales from that registration statement, a process that may take several weeks or months to conclude.

28.     To qualify as a WKSI, an issuer must not be an "ineligible issuer." Rule 405 defines an "ineligible issuer" to be, among other characteristics, an issuer that has (or whose subsidiary has) been convicted of a felony or misdemeanor specified in four enumerated provisions under Section 15 of the Exchange Act or an issuer that has violated (or whose subsidiary has violated) the anti-fraud provisions of the federal securities laws (or that are subject of a judicial or administrative decree or order prohibiting certain conduct or activities involving the anti-fraud provisions of federal securities laws) within the last three years. Ineligible issuer status attaches automatically upon a securities violation.

29.     Despite the automatic imposition of ineligible issuer status, Rule 405 permits the SEC to grant waivers of ineligible issuer status "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer." Since the 2005 Offering Reform, the SEC has often granted ineligible issuer status waivers, permitting issuers, including Barclays, to retain their WKSI status despite violating the federal securities laws.

### 3.    Barclays' Note Shelf Offerings with Defendants as Indenture Trustees

30.     Historically, Barclays has offered and sold securities in the United States pursuant to an effective shelf registration statement on Form F-3.

31.     A shelf registration statement is a filing with the SEC to register a public offering,

usually where there is no present intention to immediately sell all of the securities being registered. A shelf registration statement permits multiple offerings based on the same registration.

32.     The Barclays shelf registration statement was largely used by Barclays's Structured Products Group for the offer or sale of ETNs and structured notes, including the ETNs at issue in this case, identified in paragraph 18, *supra*.[2]  A structured note is a debt security whose return is based on equity indexes, a single equity, a basket of equities, interest rates, commodities, or foreign currencies.

33.     On occasion, the Group Treasury at Barclays also uses the shelf registration statement to sell corporate debt securities.[3]

34.     At all relevant times, Defendants served as indenture trustees of Barclays' note shelf offerings at issue in this case, pursuant to the Indenture. The background of the Indenture and its relevant terms are discussed in a separate section below.

### 4.     Defendants Learn of Barclays's Loss of Its WKSI Status

35.     On May 10, 2017, the SEC instituted public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of Barclays—arising out of its former wealth and investment management business. In *In the Matter of Barclays Capital Inc*., Adm. Proc. File No. 3-17978 (May 10, 2017), Barclays agreed to pay $97 million to the SEC for overcharging clients for mutual funds, in connection with settling the action.

36.     As a result of that settlement, Barclays automatically became an ineligible issuer under Rule 405 and lost its status as a WKSI for a period of three (3) years. *See* 17 C.F.R. § 230.405.

---

[2] SEC Order, ¶16.
[3] SEC Order, ¶16 (Sept. 29, 2022), available at https://www.sec.gov/litigation/admin/2022/33-11110.pdf

37.     Loss of WKSI status meant that, among other things, Barclays would be unable to file automatically effective shelf registration statements. Thus, Barclays could no longer register indeterminate amounts of different types of securities on immediately effective registration statements. Additionally, loss of WKSI status meant that Barclays could no longer use an automatic shelf registration statement and pay filing fees on a "pay-as-you-go" basis at the time of each takedown off the shelf. This forced Barclays, as a practical matter, to quantify the total amount of securities that it planned to offer in order to pay the registration fees for those securities in advance. This also meant that Barclays needed to track the amount of securities that it sold over the duration of the shelf to ensure that it did not exceed the amount registered.

38.     Following the loss of WKSI status, according to the SEC, Barclays's personnel understood the consequences of this status change – that Barclays had to track actual offers and sales of securities on a real-time basis.[4] These consequences included implementing an internal mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.[5]

39.     On February 22, 2018, Barclays filed an amended registration statement to convert its prior 2016 WKSI shelf, pursuant to which it offered and sold the ETNs at issue in this case, described in paragraph 18, *supra*, to a non-WKSI shelf, 2018 Shelf, which was declared effective on March 30, 2018.[6] The 2018 Shelf included a specification of the maximum aggregate offering

---

[4] SEC Order, ¶19.
[5] *Id.*
[6] *See* Barclays' March 2018 Shelf Registration Statement (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/000119312518098676/d450194dposam.htm; Notice of Effectiveness (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/999999999518000718/xslEFFECTX01/primary_doc.xml.

price, price per note, and thus number of ETNs available to be offered or sold from the 2018 Shelf.

40.     On that same date, February 22, 2018, Barclays and Defendants also entered into a "Supplemental Indenture," which supplemented the original September 16, 2004 Indenture. The Supplemental Indenture was included as Exhibit 4.2 to the February 22, 2018 Post-Effective Amendment No. 1 to Barclays' Registration Statement, which disclosed Barclays' loss of WKSI status and the limitation as to the amount and number of ETNs that Barclays may issue under the 2018 Shelf.

41.     Critically, Defendants were Indenture Trustees of the ETNs offered and sold under the 2016 WKSI shelf and the converted 2018 Shelf, pursuant to the Indenture.

42.     Upon information and belief, Defendants received and reviewed records, including the 2016 WKSI shelf and the 2018 Shelf's offering documents, that demonstrated that Barclays lost its WKSI status and showed that – unlike Barclays's prior note offerings under the 2016 WKSI shelf and earlier shelf registration statements – starting with the 2018 Shelf, Barclays was no longer permitted to include unlimited amounts of notes but instead its note offerings were strictly limited to the amounts, and thus number of notes, registered pursuant to each of Barclays' shelf offerings such as the 2018 Shelf. Indeed, the execution of the Supplemental Indenture on the same date as the 2018 Shelf, and the inclusion of such Supplemental Indenture as an exhibit to Barclays' Post-Effective Amendment No. 1 that was filed on that same date and explained Barclays' loss of WKSI status and limitation on the number and amount of ETNs that it may issue going forward, further evidences of Defendants' awareness of those matters.

43.     On June 14, 2019, Barclays filed another shelf registration statement for a new non-

WKSI shelf, the 2019 Shelf, to replace the 2018 Shelf.[7] The 2019 Shelf, which governed the offering and sales of the ETNs at issue in this case identified in paragraph 18, *supra*, was declared effective on August 1, 2019, and registered $20.76 billion of debt securities.[8]

44.    The securities registered and issued pursuant to the 2019 Shelf consisted of structured notes and ETNs, including those ETNs at issue in this case.[9]

45.    Defendants were also indenture trustees of the notes issued under to the 2019 Shelf pursuant to the Indenture.

46.    Pursuant to the terms of both the 2018 Shelf and 2019 Shelf, the Indenture, applicable law, and industry practices, Barclays and Defendants were required to track the aggregate amount of securities that were offered and sold from each respective shelf on a real-time basis, thereby ensuring that no Barclays notes were offered or sold in excess of what had been registered.

5.    **Barclays' Non-WKSI Status Working Group and the Calculation of the Amounts of Notes to Be Issued Under Shelf Registrations, with Defendants as Indenture Trustees**

47.    Following the May 2017 SEC cease-and-desist proceedings and order, Barclays needed to address its loss of WKSI status with respect to its ongoing securities offerings in the United States. Barclays self-reported that, in or around January 2018, it formed a working group ("Working Group") "that included trading desk heads from the Structured Products Group,

---

[7] *See* Barclays June 14, 2019 Shelf Registration Statement (June 14, 2019), available at https://www.sec.gov/Archives/edgar/data/312070/000119312519173793/d756161df3.htm.
[8] *See* Barclays August Shelf 2019 Registration Statement (Aug. 1, 2019), available at www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm; Notice of Effectiveness (Aug. 1, 2019), available at www.sec.gov/Archives/edgar/data/312070/999999999519001783/xslEFFECTX01/primary_doc.xml.
[9] Generally, ETNs are commonly short-term trading products that can degrade significantly over time and are not designed to be used as a long-term buy-and-hold investment.

personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department."[10] The Working Group endeavored to calculate the total amount of securities they anticipated selling for Barclays shelf registration statements in 2018 and 2019 for its U.S. structured note business during Barclays period as an ineligible issuer.

48.    The Working Group principally focused on two issues. First, the Working Group considered whether to amend the existing registration statement to convert the existing WKSI shelf into a non-WKSI shelf for approximately 18 months or to file a new registration statement to register a new, non-WKSI shelf for three years.[11]  The Working Group concluded that the shelf conversion was the better option and converted the WKSI shelf into what eventually became the 2018 Shelf, with Defendants as indenture trustees.[12]

49.    Second, the Working Group worked with the trading desks that would be using the 2018 Shelf in their business, as well as Group Treasury, to calculate the total amount of securities that they anticipated offering and selling over the next approximately 18 months, given that Barclays sought to register the total amount of securities that it anticipated offering and selling during that period and pay the registration fees for that amount of securities in advance.[13]  As part of these calculations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available.

---

[10] SEC Order, ¶20.

[11] *Id.* at ¶21.

[12] *See Id.*

[13] *Id.* at ¶22.

50.     On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior registration statement on Form F-3, and on March 30, 2018, Barclays' post-effective amendment was declared effective.[14]  The filing fees for the 2018 Shelf covered the offer or sale of approximately $21.3 billion of securities, for a period of approximately 18 months.[15]

51.     As stated above, Defendants were the Indenture Trustee for the notes issued under the 2018 Shelf, pursuant to the Indenture.

52.     While performing the work described herein, members of the Working Group recognized, discussed and understood the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis.[16]  Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other Barclays personnel performing that task.[17]

53.     As the 2018 Shelf approached its expiration in 2019, the Working Group reconvened with largely the same membership as in 2018.[18] As during the 2018 WKSI shelf conversion, the Working Group calculated the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and determined an initial allocation of fees among the trading desks accessing the 2019 Shelf.

54.     Unlike during its work in 2018, however, the Working Group's 2019 Shelf work required it to perform "Carry-Over Calculations."[19]

---

[14] *Id.* at ¶23.
[15] *Id.*
[16] SEC Order, at ¶24.
[17] *Id.*
[18] *Id.* at ¶25.
[19] *See id.*

55.    The Carry-Over Calculations were necessary because the 2018 Shelf had excess securities still available to offer or sell.[20] Accordingly, the Working Group needed to determine two amounts: (1) how much was needed for offers or sales of securities from the 2018 Shelf during the time between when Barclays filed the 2019 Shelf Registration Statement and when the 2019 Shelf became effective ("Gap Period"); and (2) how many securities would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales.[21] Barclays de-registered those remaining securities and used the fees that were originally assessed on those securities to offset a portion of its registration fees due for the 2019 Shelf Registration Statement.[22]

56.    The Carry-Over Calculations also required knowing how many securities were already issued under 2018 Shelf.  The Working Group had to calculate that amount manually, as well as estimate the forward-looking amounts, because there was no internal control in place to monitor the issuance of securities under a shelf registration statement.

57.    On August 1, 2019, Barclays' registration statement on Form F-3 was declared effective.[23] The filing fees for the 2019 Shelf Registration Statement covered the offer or sale of approximately $20.8 billion of securities, for a period of three years.[24]

58.    As stated above, the indenture trustee of the notes issued under the 2019 Shelf were Defendants, pursuant to the Indenture.

59.    Despite the labor-intensive work to manually calculate the Carry-Over Calculations and the payment of registration fees related to the 2019 Shelf, Barclays failed to establish any

---

[20] *Id.* at ¶26.
[21] *See id.*
[22] SEC Order, at ¶26.
[23] *Id.* at ¶27.
[24] *See id.*

internal control to track offers and sales of securities on a real-time basis and no member of the Working Group or other Barclays personnel was performing that task.[25]

### 6. Defendants Allow Barclays to Over-Issue Securities in Excess of the 2018 and 2019 Shelf Registration Statements

60.     According to the SEC Order, on March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities whose indenture trustee were Defendants remained available to be offered and sold off the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities.[26]

61.     Shortly thereafter, Barclays made several attempts to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of securities that remained available for sale.[27] The SEC Order states that as a result of these calculation efforts, it was "clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered."[28]

62.     Then, on or around March 9, 2022, Barclays concluded that securities whose indenture trustee were Defendants had been offered and sold in excess of what had been registered on the 2019 Shelf, and Barclays needed to halt new offers and sales of securities from that shelf, effectively suspending its structured note business.[29]

63.     Five days later, on March 14, 2022, Barclays notified regulators about the over-issuance and announced to investors that it did not have sufficient issuance capacity to support

---

[25] *Id.* at ¶28.
[26] *Id.* at ¶29.
[27] *Id.* at ¶30.
[28] *Id.* (All emphasis has been added unless otherwise noted.).
[29] *See* SEC Order, ¶¶7, 29.

further sales from inventory and any further issuances of the VXX and certain other ETNs.[30] However, Barclays did not disclose the over-issuance at this time, but instead merely stated that it "does not currently have sufficient issuance capacity to support further sales from inventory and any further issuance of the ETNs."

64.    That announcement further stated that "[t]his suspension may cause fluctuations in the trading value of [VXX]," but that "Barclays expect[ed] to reopen sales and issuances of [VXX] ETNs as soon as it c[ould] accommodate additional capacity for future issuances." This explanation, though true, did not include any information regarding Barclays' unlawful issuance of approximately $1.3 billion of unregistered notes under the 2018 Shelf, or the unlawful issuance of approximately ***$16.37 billion*** of unregistered notes under the 2019 Shelf.

65.    Two weeks later, on March 28, 2022, Barclays filed a Form 6-K with the SEC and publicly disclosed details around its internal control issues, a forthcoming rescission offer to purchasers of unregistered securities in the over-issuance, and an estimate of potential financial impact of the over-issuance at around £450 million ($590 million).[31]  In the March 28, 2022 Form 6-K, Barclays also told the market that it commissioned an independent review of "the control environment related to such issuances" and that "regulatory authorities are conducting inquiries and making requests for information" concerning the over-issuance. The March 28, 2022 Form 6-K also included a copy of Barclays's press release announcing, among other things, that (1) Barclays had sold $15.2 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement, and (2) Barclays would conduct a rescission offer:

---

[30] *See id.* at ¶31.
[31] *See id.* at ¶32.

> ***BARCLAYS has determined that the securities offered and sold under its US shelf registration statement during a period of approximately one year exceeded the registered amount (such excess, the "Affected Securities")[Note 1] giving rise to a right of rescission among certain purchasers of Affected Securities requiring BARCLAYS to repurchase the Affected Securities at their original purchase price. As a result, BARCLAYS has elected to conduct a rescission offer to eligible purchasers of the Affected Securities. Details of the rescission offer will be published by BARCLAYS in due course.***

> Based on current market prices of the Affected Securities and the estimated pool of potentially eligible purchasers electing to participate in the rescission offer, Barclays expects the rescission losses (net of tax) to be c.£450m …

> Note 1: ***In August 2019, BARCLAYS registered US\$20.8bn in maximum aggregate offering price of securities (the "Registered Amount") and has exceeded the Registered Amount by approximately US\$15.2bn.***[32]

66.    On April 22, 2022 and April 28, 2022, Barclays issued press releases announcing the suspension of more than thirty (30) additional ETNs. The indenture trustee for those ETNs were Defendants.

67.    Barclays revealed that the Carry-Over Calculations described above were incorrect because the Company had de-registered too large an amount of securities from the 2018 Shelf.[33] As a result, beginning on June 26, 2019, Barclays offered and sold approximately \$1.3 billion of securities in excess of what had remained on the 2018 Shelf.[34]

68.    These miscalculations elongated the time period covered by the over-issuance of notes whose indenture trustee were Defendants and increased the total amount of the over-issuance.[35] In the end, the Company offered and sold – following Defendants' improper review, permission, and green light – approximately: (i) \$16.37 billion of securities in excess of the amount

---

[32] *Barclays PLC and Barclays Bank PLC Impact of over-issuance under BARCLAYS US Shelf* (Mar. 28, 2022) (emphasis added).
[33] *See id.* at ¶33.
[34] *Id.*
[35] *See id.* at ¶34.

registered with the SEC from the 2019 Shelf; and (ii) $1.3 billion of securities in excess of what

had remained on the 2018 Shelf for (iii) a grand total of $17.7 billion in over-issuances for whom

Defendants were indenture trustee.[36]

69.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where

Nigel Higgins, Chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their

2022 AGM Statements.[37] In his 2022 AGM Statement, Higgins addressed the over issuance:

> As I have said before, ***we do not get everything right***. Let me say a few words about
> our recently reported failure to comply with SEC registration requirements, a
> failure which has cost us hundreds of millions of pounds, and more in reputation.
> ***First, all of us here were dismayed that, after so much progress, we had this
> entirely self-inflicted problem. We have not yet finished the review but I believe
> that we will find that, in all our complexities, we missed some simple tasks. <u>This
> is not rocket science</u>*** and we can and will do better, learning the lessons from this
> particular issue and applying discipline across all of our controls. [(emphasis
> added).]

70.    Venkatakrishnan also addressed the over-issuance in his remarks on May 4, 2022:

> Our strong performance in 2021 has carried over into the first quarter of this year,
> although we have seen a disappointing increase in costs. This has been driven in
> particular by the over securities in the US, which Nigel talked about. Let me echo
> his comments. ***This situation was entirely avoidable and I am deeply disappointed
> that it occurred.***
>
> The necessity of a strong controls culture has never been clearer to me. ***In fact, we
> have made considerable progress improving our controls since 2016. So the fact
> that this happened is particularly upsetting***. [(emphasis added).]

71.    Higgins' and Venkatakrishnan's admissions that the over-issuance of notes whose

indenture trustee were Defendants was entirely avoidable, that it was a simple control that was not

in place, and that it was not "rocket science" to stop the over-issuance from taking place, evidences

that the Defendants, who also bore responsibility for reviewing the offering materials, confirming

---

[36] SEC Order, at ¶34.
[37] Barclays 2022 AGM Statement.

that the notes whose indenture trustees they were being issued within the approved (registered) limits, and not allowing notes in excess of those limits to be released into the marketplace, were grossly negligent and/or severely or deliberately reckless in not discharging their duties as indenture trustees to stop the over-issuance.

### 7. Barclays's Rescission Offer as to Notes Whose Indenture Trustee Were Defendants

72.     On July 25, 2022, before the market for Barclays ETNs opened for the day, Barclays issued a press release announcing that it would commence a rescission offer on August 1, 2022 for a total of approximately "$17.6 billion of relevant securities issued in excess of amounts registered by Barclays under its U.S. shelf registration statements. Such securities consist of c.U.S.$14.8 billion of structured notes and c.U.S.$2.8 billion of exchange traded notes."[38] Defendants were the Indenture Trustee for all the notes subject to Barclays's rescission announcement.

73.     On July 28, 2022, before the trading opened for the day, Barclays issued interim financial results for the six-month period ending June 30, 2022 ("Q2 2022 RA").[39] A copy of the Q2 2022 RA was filed by Barclays with the SEC on as Exhibit 99.1 to a Form 6-F on July 28, 2022.

74.     In the Q2 2022 RA, Barclays informed investors that it had also over-issued unregistered securities under a second shelf registration statement: "while the vast majority of the over-issuance occurred under the [August 2019 Shelf Registration Statement], a small portion of the over-issuance also occurred under the Predecessor Shelf [the March 2018 Shelf Registration Statement]."[40] The Indenture Trustee for the notes over-issued under the 2018 Shelf were Defendants.

---

[38] *See* Barclays Bank PLC to Commence Rescission Offer (July 25, 2022).
[39] Barclays Q2 2022 RA.
[40] *Id.* at 30.

75.    On August 1, 2022, before the market opened, Barclays filed a Form 424B5 with the SEC and commenced a Rescission Offer for $17.6 billion over-issued securities that had been improperly allowed by Defendants to enter the marketplace and had been sold pursuant to the 2018 and 2019 Shelf Registration Statements, whereby Barclays offered "to repurchase the applicable securities from relevant purchasers who acquired such securities, at their purchase price plus interest, less the amount of any interest, coupon payments, principal or other income received pursuant to the terms of the securities, or to pay rescissory damages if such securities, after being purchased, were sold, redeemed or matured at a loss." According to the Prospectus that Barclays filed with the SEC on August 1, 2022, as well as an amended thereto filed on August 12, 2022, the rescission offer applied to more than 3,000 structured notes and ETNs. Defendants were the Indenture Trustee of all those ETNs.

76.    The August 1, 2022 Form 424B5 disclosed that from February 18, 2021 through March 2022, Barclays sold approximately $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the 2019 Shelf Registration Statement (for a total of approximately $37 billion).

77.    The August 1, 2022 Form 424B5 also disclosed that Barclays sold an additional $1.27 billion of unregistered securities in excess of the maximum aggregate amount registered pursuant to the 2018 Shelf Registration Statement.

78.    The Rescission Offer commenced on August 1, 2022 and expired on September 12, 2022. Plaintiff, and other investors, attempted to take advantage of the Recission Offer by properly submitting claims to the Barclays portal before the stated deadline. Plaintiff and other members of the class received the same email – a notification that *each of their claims* had been rejected.

22

**8.    The Over-Issued and Unlawful Barclays Notes Improperly Allowed by Defendants to Enter the Marketplace Taint the Entire Note Pool, Render Investors Unable to Participate in Rescission**

79.    The August 1, 2022 rescission offer also disclosed that the subject ETNs that were issued in excess of the limits of the 2018 and 2019 Shelfs as a result of Defendants' breach of duties were not "readily distinguishable from ETNs of the same series that were properly offered and sold" because the ETNs were placed in Barclays DTC account and "existed as a fungible pool" with the same CUSIP.

80.    For this reason, in addition to over issuing said notes following Defendants' improper review and approval, Barclays also had no way of tracing which ETNs were registered or unregistered.

81.    The Rescission Offer also stated that ETN investors would "face ***significant evidentiary issues that are likely to make it difficult, if not impossible,*** for such investors to present sufficient evidence to prove that they meet the eligibility requirements to be considered an Eligible Investor and participate in this Rescission Offer." (emphasis added).

82.    Due to these evidentiary issues, nearly all submitted claims were rejected by Barclays because it could not verify whether ETNs were registered or unregistered, regardless of the amount of evidence investors submitted.

83.    After trading had been halted for months, followed by Barclays refusal to honor its promised Rescission Offer, investors were left with ETNs that had little to no value.

84.    On September 12, 2022 the rescission offer ended, and many investors were left holding the bag. The price of the ETNs suffered substantial drops. For instance, the price of VXX had fallen to $72.60.

85.     On September 19, 2022, after the failed Rescission Offer, Barclays began issuing additional shares of VXX and the price of VXX further dropped to $71.96, a mere fraction of the class period high of $1,261.44.

86.     By the end of the Class Period, Defendants' failures caused the ETN investors in notes whose indenture trustee were Defendants, including Plaintiffs, to suffer substantial losses. For instance, VXX investors, including Plaintiffs, sustained markets losses of more than $1.5 billion.

## B. Defendants' Role as Indenture Trustees and Gatekeepers of the Barclays Notes

87.     The U.S. Trust Indenture Act of 1939, 15 U.S. Code § 77aaa *et. seq.* (the "Trust Indenture Act") was enacted for a specific purpose – namely, to safeguard "the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public…."

88.     The Trust Indenture Act enumerates several instances in which investors' interests are adversely impacted, including, *inter alia*:

a.     "when the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of such investors….";

b.     "when… trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act….";

c.     "when the trustee… has any relationship to or connection with the obligor or any underwriter of any securities of the obligor, or holds, beneficially or otherwise, any

interest in the obligor or any such underwriter, which relationship, connection, or interest involves a material conflict with the interests of such investors…";

d.  "when the obligor is not obligated to furnish to the trustee under the indenture and to such investors adequate current information as to its financial condition, and as to the performance of its obligations with respect to the securities outstanding under such indenture ….";

e.  "when the indenture contains provisions which are misleading or deceptive, or when full and fair disclosure is not made to prospective investors of the effect of important indenture provisions…."; and

f.  "when, by reason of the fact that trust indentures are commonly prepared by the obligor or underwriter in advance of the public offering of the securities to be issued thereunder, such investors are unable to participate in the preparation thereof, and, by reason of their lack of understanding of the situation, such investors would in any event be unable to procure the correction of the defects enumerated in this subsection."

89.  In recognition of the fact that the foregoing situations are harmful to investors, among other parties, the Trust Indenture Act declares that it is its policy to address and eliminate such concerns in the context of public offerings of securities. Specifically, as the Act states: "it is hereby declared to be the policy of this subchapter, in accordance with which policy all the provisions of this subchapter shall be interpreted, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings."

90.  The Trust Indenture Act prescribes the duties and responsibilities of the indenture trustee, both prior to and after a default, as the indenture defines it. 15 U.S.C. § 77ooo. According

to the Act, prior to a default, a trustee's responsibilities are those "specifically set out" in the indenture. The trustee "may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture." However, the trustee must "examine the evidence furnished to it" as documentation of the obligor's compliance with the provisions of the indenture, pursuant to 15 U.S.C. § 77nnn, "to determine whether or not such evidence conforms to the requirements of the indenture."

91.    The Trust Indenture Act further prescribes a trustee's responsibilities after a default, as defined by the indenture. In such instance, the trustee's responsibilities are more expansive. The trustee is to exercise "the rights and powers vested in it by such indenture," but in addition, must "use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."

92.    More specifically, under the Act, a trustee's post-default responsibilities are as follows:

> The indenture to be qualified shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that—
>
> ***
>
> (2) such indenture shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions protecting the indenture trustee from liability for any error of judgment made in good faith by a responsible officer or officers of such trustee, ***unless it shall be proved that such trustee was negligent in ascertaining the pertinent facts***….

93.    In addition to the Trust Indenture Act, the New York Uniform Commercial Code ("NY UCC") speaks to the duties of the authenticating trustee, transfer agent, and registrar, duties

– which Defendant BNY Mellon undertook as Trustee for the Senior Debt Securities as defined herein – vis-à-vis the holder of issued securities. Section 8-407 of the NY UCC states that:

> A person acting as **authenticating trustee, transfer agent, registrar**, or other agent for an issuer in the registration of a transfer of its securities, in the issue of new security certificates or uncertificated securities, or in the cancellation of surrendered security certificates **has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the  particular functions performed as the issuer has in regard to those functions**.

### C. Defendants' Duties as Indenture Trustees

94.     Defendant BNY Mellon's duties and responsibilities as Indenture Trustee arise from a Senior Debt Securities Indenture entered into by Barclays and Defendant BNY Mellon on September 16, 2004 (the "2004 Indenture"). The 2004 Indenture, a "valid agreement" between the parties, was executed in order "to provide for the issuance from time to time of [Barclays'] unsecured and unsubordinated debentures, notes or other evidences of indebtedness (herein called the "Senior Debt Securities"), to be issued in one or more series as in this Senior Debt Securities Indenture provided."[41]

95.     Defendant BNY Mellon was designated the Trustee under the 2004 Indenture.

96.     As an overarching principal, the 2004 Indenture makes clear that Defendant BNY Mellon's responsibilities under as Trustee were to be governed by the Trust Indenture Act and any amendments thereto. As Section 6.01 of the 2004 Indenture specifically states, "[t]he duties and responsibilities of the Trustee shall be as provided by the Trust Indenture Act."

97.     According to Section 3.01 of the 2004 Indenture, Senior Debt Securities may be issued pursuant to the 2004 Indenture "in one or more series." That provision of the 2004 Indenture sets forth how a "series" is established, including the establishment of a limit to the amount of

---

[41] https://www.sec.gov/Archives/edgar/data/312070/000119312505147150/dex43.htm

Senior Debt Securities in a given series that may be authenticated and delivered. Specifically, Section 3.01 of the 2004 Indenture provides that:

> There shall be established by or pursuant to a Board Resolution [by Barclays' Board] and, subject to Section 3.03, set forth, or determined in the manner provided, in an Officer's Certificate, or established in one or more indentures supplemental hereto, ***prior to the initial issuance of Senior Debt Securities of any series***,
>
> (a) the title of the Senior Debt Securities of the series (***which shall distinguish the Senior Debt Securities of the series*** from all other Senior Debt Securities);
>
> (b) ***any limit upon the aggregate principal amount of the Senior Debt Securities of the series which may be authenticated and delivered*** under this Senior Debt Securities Indenture (except for Senior Debt Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Senior Debt Securities of the series pursuant to Section 3.04, 3.05, 3.06, 9.06 or 11.07 and except for any Senior Debt Securities which, pursuant to Section 3.03, are deemed never to have been authenticated and delivered hereunder)….[42]

98.     The 2004 Indenture allocates to Defendant BNY Mellon the responsibility to authenticate Senior Debt Securities. When a series of Senior Debt Securities is established, Defendant BNY Mellon, as Trustee pursuant to the 2004 Indenture, receives copies of the relevant resolutions of the Barclays Board in accordance with its authentication responsibilities:

> If the forms of Senior Debt Securities of any series and any Coupons to be attached thereto, or any of the terms thereof, are established by action taken by the Board of Directors of [Barclays], copies of the Board Resolutions in respect thereof ***shall be delivered to the Trustee*** at or prior to the delivery of the Company Order pursuant to Section 3.03 ***for the authentication and delivery of such Senior Debt Securities***.

99.     Section 3.03 of the 2004 Indenture further delineates Defendant BNY Mellon's responsibilities for, *inter alia*, authenticating series of Senior Debt Securities executed by Barclays. Specifically, the 2004 Indenture states:

> At any time and from time to time after the execution and delivery of this Senior Debt Securities Indenture, ***the Company may deliver Senior Debt Securities of any series executed by the Company . . . to the Trustee for authentication, together***

---

[42] Unless otherwise indicated, all emphasis is added and not contained in the original.

*with a Company Order for the authentication and delivery of such Senior Debt Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Senior Debt Securities*.

100.    Under the 2004 Indenture, BNY Mellon's authentication of a given series of Senior Debt Securities is expressed in unequivocal terms. Section 2.02 of the 2004 Indenture sets forth the form of the Certificate of Authentication to be executed by BNY Mellon when authenticating Senior Debt Securities:

CERTIFICATE OF AUTHENTICATION

This is one of the Senior Debt Securities of the series designated herein referred to in the within-mentioned Senior Debt Securities Indenture.

Date: _____

THE BANK OF NEW YORK,
        as Trustee

By: _____
        Authorized Signatory

101.    Although under certain circumstances, Defendant BNY Mellon was entitled to receive and rely upon an "Opinion of Counsel" stating that the "form or terms" of the Senior Debt Securities "have been established in conformity with the provisions of the Senior Debt Securities Indenture," the 2004 Indenture sets forth certain circumstances under which the Trustee can exercise its discretion to not authenticate Senior Debt Securities. This includes when the Trustee has determined, or has been advised by counsel, that authentication would not be lawful or when doing so would affect the Trustee's rights and obligations. Defendant BNY Mellon thus had the discretion to decline to authenticate the Senior Debt Securities at issue in this litigation and could have done so validly under the 2004 Indenture if it had deemed it "not reasonably acceptable" to Defendant BNY Mellon to authenticate the notes. Specifically, according to the 2004 Indenture:

The Trustee shall not be required to authenticate such Senior Debt Securities if the issue of such Senior Debt Securities pursuant to this Senior Debt Securities Indenture will affect the Trustee's own rights, duties or immunities under the Senior Debt Securities or any Coupons and this Senior Debt Securities Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

The Trustee shall have the right to decline to authenticate and deliver any Senior Debt Securities under this Section if the Trustee, being advised by counsel, determines that such action may not lawfully be taken.

Section 3.03. That section further provides that "[e]ach registered Senior Debt Security shall be dated the date of its authentication."

102.    Under the terms of the 2004 Indenture, Defendant BNY Mellon, as Trustee, is also appointed as the registrar for Senior Debt Securities issued pursuant thereto. As Section 3.05 of the 2004 Indenture states:

The Company shall cause to be kept ***at the Corporate Trust Office of the Trustee a register*** (the register maintained in such office and in any other office or agency of the Company in a Place of Payment being herein sometimes collectively referred to as the "Senior Debt Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Senior Debt Securities and of transfers of Senior Debt Securities. ***The Trustee is hereby appointed "Senior Debt Security Registrar" for the purpose of registering Senior Debt Securities and transfers of Senior Debt Securities as herein provided***.

103.    In enumerating Defendant BNY Mellon's responsibilities as registrar, the 2004 Indenture tasks BNY Mellon with keeping track of the "holders of registered Senior Debt Securities." As Section 7.02 provides that:

The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders (i) contained in the most recent list furnished to the Trustee as provided in Section 7.01 and (ii) received by the Trustee in its capacity as Paying Agent or Senior Debt Security Registrar (if so acting).

104.    Indeed, where the Trustee acts as Senior Debt Security Registrar, Barclays is relieved of the responsibility for furnishing the names and addresses of the Senior Debt Securities holders. According to Section 7.01:

The Company need not furnish or cause to be furnished to the Trustee pursuant to this Section 7.01 the names and addresses of Holders of registered Senior Debt Securities so long as the Trustee acts as Senior Debt Security Registrar with respect to such series of Senior Debt Securities.

105.    The laws of the State of New York govern the 2004 Indenture and the Senior Debt Securities issued, authenticated, and delivered thereunder. As the 2004 Indenture states:

Section 1.12. *Governing Law*. This Senior Debt Securities Indenture and the Senior Debt Securities and the Coupons shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws of that State, except that the authorization and execution of this Senior Debt Securities Indenture, the Senior Debt Securities and the Coupons shall be governed (in addition to the laws of the State of New York relevant to execution) by the respective jurisdictions of organization of the Company and the Trustee, as the case may be.

106.    Thus, as authenticating trustee, transfer agent, and registrar, BNY Mellon was both contractually obligated and duty bound to follow both the language of the 2004 Indenture, as well as customary practice to ensure that it adhered to the limits upon the aggregate principal amount of the Senior Debt Securities of the series which may be authenticated and delivered as set forth in the offering documents.

107.    Importantly, the New York Uniform Commercial code specifically provides that by signing a security certificate as an authenticating trustee, as Defendant BNY Mellon was here, that trustee warrants to purchasers of the security that, among other things, the trustee "has reasonable grounds to believe that the certified security is in the form and within the amount the issuer is authorized to issue."

108.    Section 8-208 of the New York UCC provides as follows:

§ 8-208. Effect of Signature of Authenticating Trustee, Registrar, or Transfer Agent

(3) the person has reasonable grounds to believe that the certificated security is in the form and within the amount the issuer is authorized to issue.

109.    According to the Official Comment to NY UCC § 8-208, that provision "express[es] the current understanding and prevailing case law as to the effect of the signatures of authenticating trustees, transfer agents, and registrars." (Citation omitted.) The Official Comment further states that "neither a registrar nor an authenticating trustee should properly place a signature upon a certificate without determining whether it is at least regular on its face. The obligations of these parties in this respect have therefore been made explicit in terms of due care." (Citation omitted.)

110.    Notably for purposes of this Complaint:

> Authenticating trustees, registrars, and transfer agents *have normally been held liable for an issue in excess of the authorized amount*…. In imposing upon these parties a duty of due care with respect to the amount they are authorized to help issue, this section does not necessarily validate the security, but *merely holds persons responsible for the excess issue liable in damages for any loss suffered by the purchaser.*

NY UCC § 8-208, Official Comment 3 (internal citations omitted) (emphasis added).

## V.    CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Barclays ETNs whose indenture trustee were Defendants, on a U.S. open market during the class period February 21, 2019 through September 12, 2022, both dates inclusive (the "Class"). Excluded from the Class are Defendants in this action, BPLC, Barclays, the officers and directors of Defendants, BPLC, and/or Barclays during the Class Period (the Excluded D&Os), members of Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

112.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.

113.    Throughout the Class Period, Barclays ETNs whose indenture trustee were Defendants actively traded on the CBOE under the symbols set forth in Paragraph 18, *supra*. Millions of Barclays ETNs were traded publicly during the Class Period on the CBOE.

114.    As of August 12, 2022, Barclays had more than 183 million ETNs outstanding, whose indenture trustee were Defendants. Record owners and other members of the Class may be identified from records maintained by Barclays, Defendants, and/or their transfer agent and may be notified of the pendency of this action by mail, using a customary form of notice.

115.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct that is complained of herein.

116.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants violated their express duties under the Indenture (including supplements and amendments);

(b) Whether Defendants violated their implied covenants under the Indenture (including supplements and amendments);

(c) Whether Defendants had obligations to Plaintiff and the Class arising under the Indenture or arising by operation of law;

(d) Whether Defendants violated their obligations arising under the Trust Indenture Act, New York statutory law, and/or New York common law by the acts and omissions as alleged herein;

(e) Whether Defendants' conduct was grossly negligent or reckless;

(f) The extent to which the members of the Class have sustained damages as a result of Defendants' conduct, and the proper measure of damages.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

119.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## COUNT I

## BREACH OF CONTRACT

120.    Paragraphs 19 through 110 hereof are incorporated by reference.

121.    The Trust Indenture is a contract between Barclays Bank, PLC and The Bank of New York, as Indenture Trustee. Throughout the existence of the Trust Indenture, the Noteholders were and are intended third-party beneficiaries of the Trust Indenture. Accordingly, plaintiffs, on behalf of themselves and other members of the Class, have standing to assert this claim for breach

of contractual obligations provided in the Trust Indenture. [Sec. 1.11. *Benefits of Senior Debt Securities Indenture.* Nothing in this Senior Debt Securities Indenture or in the Senior Debt Securities or the Coupons, express or implied, shall give any Person, other than the parties hereto and their successors hereunder, and the Holders of Senior Debt Securities or the holders of Coupons, any benefit or any legal or equitable right, remedy or claim under this Senior Debt Securities Indenture.]

122.    The Indenture explicitly required that securities be issued within the parameters of SEC registration (Section 3.01). Under Sections 6.01 and 6.03 of the Indenture, the Trustee is required to act with due care, relying on proper documentation before authenticating securities.

123.    Further, pursuant to its duties as Trustee, BNY Mellon was required to authenticate each Senior Debt Security ***by manual signature*** and deliver each Note in order for that Note to be valid. By way of illustration, the Trust Indenture provides, in part, that:

> At any time and from time to time after the execution and delivery of this Senior Debt Securities Indenture, the Company may deliver Senior Debt Securities of any series executed by the Company. . . to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Senior Debt Securities, and the Trustee, in accordance with the Company Order shall authenticate and deliver such Senior Debt Securities.

*    *    *

> Each registered Senior Debt Security shall be dated the date of its authentication.

*    *    *

> ***No Senior Debt Security*** or Coupon appertaining thereto ***shall be entitled to any benefit under this Senior Debt Securities Indenture or be valid*** or obligatory for any purpose ***unless there appears on such Senior Debt Security a certificate of authentication*** substantially in the form provided for herein ***executed by or on behalf of the Trustee by manual signature***, and such certificate upon any Senior Debt Security shall be conclusive evidence, and the only evidence that such Senior Debt Security has been duly authenticated and delivered hereunder and that such Senior Debt Security or Coupon is entitles to the benefits of this Senior Debt Securities Indenture. . .

Trust Indenture Section 3.03 (bold and italics added).

124.    Pursuant to its duties as Trustee, BNY Mellon was required to observe any limits set by the Barclays Board of Directors on the amount of Notes it was permitted to authenticate and deliver in any series:

There shall be established by or pursuant to a Board resolution. . .

(b) any limit upon the aggregate principal amount of the Senior Debt Securities of the series which may be authenticated and delivered under this Senior Debt Securities Indenture. . .

Trust Indenture Section 3.01.

125.    [Should we add a paragraph about where those limits were published and how they would have been known and obvious to the Trustee?] [Also, do we say anything about BNY's role as Registrar (Sec. 3.05)].

126.    BNY Mellon, as Indenture Trustee failed to follow the Indenture and customary practice and, as a result, improperly authenticated billions of dollars of Notes beyond the limits established by the Barclays Board, thereby causing financial loss to plaintiffs and other members of the Class, as set forth above. Defendants' authentication of securities beyond these limits was a direct violation of the Indenture's terms, the customary practices of an Indenture Trustee, and was a breach of the contract.

## COUNT II

## NEGLIGENCE

127.    The factual allegations set forth in paragraphs 19 through 110 hereof are incorporated by reference.

128.    As Indenture Trustee, BNY Mellon owed duties to the Noteholders under the Trust Indenture Act of 1939, New York law, and the common law, and as such, was required to act in a

prudent manner consistent with the industry standards in discharging its duties . Those duties to Noteholders included protecting their rights and interests under the Indenture, and in particular, to act with due care and rely on proper documentation including reviewing the appropriate documents regarding the Senior Debt Securities and observing any limits on the amount of Senior Debt Securities it was permitted to authenticate and deliver in any series in order to establish each Senior Debt Security's validity. *See* Sections 6.01 and 6.03.

129.    BNY Mellon breached its duty of due care to the Noteholder by failing to follow the Indenture, failing to comply with the appropriate standards of conduct under the federal, NY state, and common law, and failing to follow customary practice and failing to take reasonable steps to ensure that it did not authenticate Notes in amounts beyond the amounts set by the Barclays Board.

130.    As a result of Defendants' breach of duty, Barclays issued and sold Notes far in excess of the amounts authorized by the governing documents, the revelation of which resulted in severe economic injury to Plaintiffs and members of the proposed class.

131.    As a result of Defendants' breach of duty, Plaintiffs were proximately injured. Their injury occurred when the marketplace became aware of the unlawful issuance of the Senior Debt Securities, and that the entire pool of such Securities was tainted by the indistinguishable, unregistered Securities. Upon the marketplace becoming aware of the improper issuance, Plaintiffs became unable to sell their Securities, and those Securities' price dropped, thereafter causing injury to Plaintiffs.

WHEREFORE, Plaintiffs respectively request the Court to enter judgment in their favor and in favor of the Class as follows:

1.    Declaring this to be a class action pursuant to Rules 23(a) and (b)(3);

2. Awarding Plaintiffs and the members of the Class damages;

3. Awarding Plaintiffs and the members of the Class pre-and post-judgment interest, as

   well as attorneys' fees, expert fees and cost;

4. Awarding such other relief as this Court may deem proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.


Date: March 13, 2024                          */s/ Radha Nagamani Raghavan*
                                              Radha Nagamani Raghavan (Bar No. 5753140)
                                              Michael Dell'Angelo (*pro hac vice forthcoming*)
                                              Andrew D. Abramowitz (*pro hac vice forthcoming*)
                                              BERGER MONTAGUE PC
                                              1818 Market Street, Suite 3600
                                              Philadelphia, PA 19103
                                              Telephone: (215) 875-3000
                                              rraghavan@bm.net
                                              mdellangelo@bm.net
                                              aabramowitz@bm.net


                                              Alan L. Rosca (*pro hac vice forthcoming*)
                                              Jonathan A. Korte (*pro hac vice forthcoming*)
                                              **ROSCA SCARLATO LLC**
                                              2000 Auburn Dr. Suite 200
                                              Beachwood, OH 44122
                                              Telephone: (216) 946-7070
                                              arosca@rscounsel.law
                                              jkorte@rscounsel.law


                                              Paul J. Scarlato (*pro hac vice forthcoming*)
                                              **ROSCA SCARLATO LLC**
                                              Four Tower Bridge,
                                              200 Barr Harbor Drive, Suite 400
                                              W. Conshohocken, PA 19428
                                              Telephone: (216) 946-7070
                                              pscarlato@rscounsel.law